IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BARRY L. OSBORNE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:08-1000 |
| ) | Judge Trauger |
| ROMARK LABORATORIES, L.C., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM

Pending before the court is the defendant's Motion for Final Summary Judgment (Docket No. 35). For the reasons discussed herein, the defendant's motion will be granted and this case will be dismissed.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Defendant Romark Laboratories, L.C. ("Romark") is a biotechnology company that, among other things, develops small molecules for the treatment of various diseases.[1] The plaintiff, Barry Osborne, worked for Romark as the Director of Managed Markets (DMM) from July 25, 2005 until his termination on September 9, 2008. The DMM position is a high-level

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 36 and 55) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

sales position at Romark, with a salary of $125,000 per year, plus benefits and bonus. Romark is headquartered in Tampa, Florida, but the plaintiff worked out of a home office in Franklin, Tennessee.

Consistent with the prominence of the position, the ability to work independently and to respond timely to requests from clients and others within Romark were essential job functions of the DMM position. Additionally and among other things, the plaintiff was responsible for communicating effectively with clients and "key influencers," developing and implementing account strategies, and planning customer meetings.

While the first few years of the plaintiff's employment at Romark were apparently relatively uneventful, in the Fall of 2007, the plaintiff's direct supervisor, Jeff Crowther, gave the plaintiff a "4" out of "9" on the plaintiff's performance review. While this score indicates that the plaintiff "mostly achieved job standards" during the evaluation time frame, this was the second lowest numerical rating given to any of Crowther's direct reports during this evaluation time frame, and, both parties agree, the score indicated that Crowther had concerns about the plaintiff's work performance. (Docket No. 38 Ex. A.) In the wake of this performance review, Crowther worked with the plaintiff to improve job performance through a few additional "one on one" work sessions. Additionally, in March 2008, Crowther flew from Florida to Nashville, Tennessee, to meet with the plaintiff for a two-day review of continuing issues with the plaintiff's job performance.

At this Nashville meeting, Crowther cautioned that the plaintiff needed to "improve overall office day productivity" and needed to "follow through on any commitments made" to

2

Romark associates, as well as to timely submit monthly reports and other materials. At the end of the second day of the meeting, Osborne informed Crowther, for the first time, that he had Attention Deficit Hyperactivity Disorder ("ADHD") and chronic depression. At this time, the plaintiff told Crowther that he did not want any special treatment because of his condition and that he wanted Crowther to keep this information confidential.

A few weeks after the Nashville meeting, Crowther sent the plaintiff an e-mail confirming the discussion at the meeting and setting out a detailed list of duties and action items for the plaintiff. Crowther also contacted Oasis, the Human Resources provider for Romark, about the plaintiff's claimed medical diagnosis. An Oasis representative advised Crowther that, from Crowther's description, it did not sound as if the plaintiff was "disabled" under the Americans with Disabilities Act (ADA) and that Crowther should continue treating the plaintiff in a manner consistent with Crowther's other direct reports.

The problems identified in the Fall 2007 performance review and then at the Nashville meeting persisted. The plaintiff continued to be untimely in the submission of monthly reports and action plans, to be unresponsive to repeated communications from Crowther and from other Romark associates, and he continued to fail to secure meetings that he had said he could secure. As just one example of many, from June 12, 2008 to July 17, 2008, Crowther sent the plaintiff five e-mails regarding the status of the plaintiff's June Monthly Report, which had been due on June 5. The plaintiff failed to respond to any of these requests for information, although he notes that he was on vacation for a portion of June.

On July 29, 2008, Crowther e-mailed the plaintiff, asking him to clear his calendar for a

one-on-one meeting in Nashville on Thursday, August 7, 2008. The purpose of this meeting was to discuss the plaintiff's continued poor job performance. The day before the scheduled meeting, Crowther e-mailed the plaintiff his flight itinerary and, later that day, Crowther e-mailed the plaintiff confirming the time and date for the meeting. Prior to the meeting, Crowther spoke with an Oasis representative about the plaintiff's continued poor job performance, and that representative advised Crowther that, based on the information that he had presented, Romark had demonstrated a sufficient record of poor performance to justify termination. Oasis also advised that, should the plaintiff cite his ADHD, Crowther should continue to focus on managing the plaintiff in a manner consistent with Crowther's other direct reports.

Crowther flew to Nashville on August 7, but the plaintiff did not show up for the meeting and did not respond to numerous phone calls and e-mails from Crowther throughout the day. Crowther continued to try to contact the plaintiff via e-mail and phone over the course of the next day, again receiving no response. On August 10, 2008, Crowther again e-mailed the plaintiff, seeking a phone conversation the next day regarding the events of the previous few days. The plaintiff did timely respond to this e-mail, and he called Crowther on August 11. When asked for an explanation of his actions, the plaintiff stated that he had been in a meeting in Atlanta on August 7, with his cell phone on "quiet." Crowther claims that the plaintiff subsequently blamed his failure to respond to Crowther's communications on computer problems, but, later in the conversation, the plaintiff conceded that he had not responded because he knew Crowther would be mad. The plaintiff refutes this version of the conversation, but there is no dispute that the plaintiff was not at the Nashville meeting and that he did not respond to messages from Crowther

4

about his whereabouts for a three-day period.

After the August 11 phone call, both Crowther and the plaintiff independently contacted Oasis. Crowther advised Oasis that he intended to terminate the plaintiff. The plaintiff contacted Oasis and advised that he was having problems at work due to his medical condition. In response, Oasis provided the plaintiff with a "Reasonable Accommodation Request Form" (RARF), to be completed by the plaintiff and his physician. On its face, the form states that, by providing the form, the employer is not recognizing that the employee has an ADA disability, and the form clearly indicates that it is a tool for the employer to use to determine if the plaintiff is disabled under the ADA. In light of the plaintiff's RARF request, senior level officials at Romark decided that the plaintiff's termination should be postponed and that Crowther should continue to work with the plaintiff on fixing areas of poor performance.

Over the next few weeks, the plaintiff continued to struggle to follow through on commitments and to respond to requests for information. For instance, on August 14, 2008, the plaintiff promised to send Crowther a recommendation for a Request for Proposal (RFP) on August 18. Despite this promise, Crowther heard nothing from the plaintiff until August 26, and, at that point, the plaintiff still did not have a recommendation. On the evening of September 2, the day before the RFP itself was due, the plaintiff submitted his recommendations for the RFP. Crowther claims that, instead of waiting for the plaintiff, he had been forced to develop the RFP himself, with assistance from Romark CFO, Brian Schnieders.

Additionally, on August 28, Schnieders contacted the plaintiff to discuss the fact that the plaintiff's RARF had not been submitted. During that phone call, the plaintiff agreed to submit

5

the paperwork by September 5. Schnieders and the plaintiff exchanged additional e-mails on September 3, in which Schnieders stated that, given that it had been three weeks since the RARF had been sent to the plaintiff, Romark would consider the accommodation request withdrawn unless it was submitted by 1 p.m. on September 5. The plaintiff assured Schnieders that the RARF would be submitted on time.

On September 5, the plaintiff sent Romark a packet of information and educational materials regarding ADHD, information about his treating physician, Dr. Robert D. Hunt of the Centers for Attention, and the plaintiff's portion of the RARF. The plaintiff, however, failed to include his physician's portion of the RARF or any actual requests for specific accommodations.

On September 9, 2008, the completed RARF had still not been submitted, and Crowther and Schnieders scheduled a conference call with the plaintiff. During the course of this call, the plaintiff was advised that he was being terminated for cause based on his poor job performance. On September 12, 2008, three days after he was terminated, the plaintiff submitted the physician's portion of the RARF. On this form, Dr. Hunt indicated that the plaintiff had "Attention Deficit Disorder – without H[yperactivity]. Good response to and tolerance of medication." Also on the form, Dr. Hunt stated that, while this impairment is permanent, "functional impairment is limited" and the ADD has "minimal operational impact" on the plaintiff's performance. Dr. Hunt did note that the plaintiff "may require slightly more time and supervision for optimal performance," as the impairment causes a "slightly slower rate of performance." Dr. Hunt recommended that the plaintiff be provided with closer supervision, more discrete work assignments, an assistant, and more time on certain projects. (Docket No. 44

6

Ex. 4.) Romark's receipt of this material did not result in any change in the employment status of the plaintiff.[2]

## ANALYSIS

The plaintiff asserts a claim of disability discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, and the Tennessee Disability Act (TDA), T.C.A. § 8-50-103 *et seq.* The defendant has moved for summary judgment on these claims for a variety of reasons, including that the plaintiff is not disabled, and, even if he were, he was terminated for legitimate, non-discriminatory reasons.

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving

---

[2]The parties dedicate several pages of the Statement of Material Facts to material related to Romark's "after acquired evidence" defense. As will be made clear herein, it is not necessary to reach this issue in order to grant summary judgment for the defendant, and, therefore, a factual discussion of this material is unnecessary.

7

party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Disability Discrimination Claims

As a preliminary matter, as the parties recognize, the plaintiff's ADA and TDA disability

discrimination claims should be evaluated under the same standard. (Docket No. 37 at 4; Docket No. 53 at 6; *see Chandler v. Speciality Tires*, 134 Fed. Appx. 921, 925 (6th Cir. 2005)). That is, in the absence of direct evidence of discrimination, in order to establish a *prima facie* claim of disability discrimination, the plaintiff must show (1) that he is "disabled" within the meaning of the ADA; (2) that he was qualified to perform the requirements of the job with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). If the plaintiff can establish the *prima facie* case of disability discrimination (or if the plaintiff provides direct evidence of discrimination), the burden shifts back to the defendant to articulate a non-discriminatory reason for its actions, and then, if the defendant meets that burden, it is the plaintiff's burden to demonstrate that the proffered explanation is pretextual. *Id.*

### A. Whether Osborne Was Disabled

Under the ADA, an individual is disabled if he has "(1) a physical or mental impairment that substantially limits one or more major life activities of such individual; [or] (2) a record of such an impairment; or (3) [been] regarded as having such an impairment." 42 U.S.C. § 12102(1).[3] The plaintiff argues that he is disabled based on this first prong. (Docket No. 53 at 6.) To qualify as disabled under this first, "substantial limits" prong, one must do more than allege a

---

[3] The court recognizes the "ADA Amendments Act of 2008," in which Congress, effective January 1, 2009, explicitly overruled major Supreme Court decisions construing the ADA and established that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." P.L. 110-325 § 4(A). The ADA amendments do not influence the court's analysis because the court is to apply the ADA law that was in place at the time the conduct complained of occurred. *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 492 (6th Cir. 2008).

9

physical or mental impairment. *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 491-92 (6th Cir. 2008). Rather, to qualify as disabled, the physical or mental impairment must have a "substantially limit[ing]" effect on a major life activity. *Id.*

As indicated above, the plaintiff's physician, Dr. Hunt, confirmed on the plaintiff's RARF that the plaintiff does have a mental impairment, that is, he suffers from ADD (no hyperactivity). (Docket No. 44 Ex. 4.) Additionally, in his deposition, Dr. Hunt testified that the plaintiff has, at times, suffered from irritability and Dysthymia, that is, a "low grade chronic depressive" state or "sort of negative mood," along with some anxiety and depression. (Docket No. 44 at 26, 60.) Therefore, the key question in the disability analysis is not whether the plaintiff has an "impairment," but whether this condition "substantially limited" a "major life activity."

At his deposition, the plaintiff claimed that his impairment substantially limited several major life activities, specifically, concentrating, sleeping, and engaging in sexual activity (not for purposes of procreation). (Docket No. 46 at 204-205.) While not mentioned on the RARF, Dr. Hunt testified at his deposition that he should have indicated, on that form, that the plaintiff's ADD and other related mental difficulties substantially limited the plaintiff in the major life activity of working. (Docket No. 44 at 40-41.)

While not disputing that working and sleeping are major life activities under the ADA, Romark first argues that concentrating and engaging in non-procreational sexual activity are not "major life activities" under the Sixth Circuit's interpretation of the ADA.[4] (Docket No. 37 at 6-

---

[4] The procreational distinction is based on the fact that the Supreme Court has found "procreating" to be a major life activity under the ADA. *Bragdon v. Abbott*, 524 U.S. 624, 638-39 (1998).

10

7.) As to concentration, it appears that Romark is correct to an extent, that is, in a workplace dispute such as this one, the fact that an employee's impairment caused difficulty concentrating, thinking and focusing at work should be considered in conjunction with whether the impairment is substantially limiting in the major life activity of working. *See Boerst v. Gen. Mills Operations*, 25 Fed. Appx. 403, 406 (6th Cir. 2002)("sleeping and working are major life activities under the ADA. Concentrating and maintaining stamina are not.").

Romark has not, however, brought forth any Sixth Circuit authority for the proposition that engaging in sexual activity is not a major life activity. Indeed, Romark only points to a single case for that proposition, and that case states only that the Sixth Circuit has not resolved the issue. *Marziale v. BP Prods. N. Am., Inc.*, 2007 WL 4224367, *7 (S.D. Ohio Nov. 27, 2007). Indeed, in *Marziale*, the district court assumed, without deciding, that sexual activity was a major life activity. *Id.* at *7-8. Therefore, the court will assume, for purposes of discussion, that sexual activity is a major life activity under the ADA, and the court will consider whether the plaintiff was substantially limited in the major life activities of sleeping, sexual activity, and working.

The test for establishing whether an impairment substantially limits a non-work major life activity, such as sleeping and sexual activity, is strict. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997). Impairments that only "moderately or intermittently" prevent one from performing one of these activities do not substantial limit the activity; rather, the plaintiff must show that the impairment "considerably or profoundly" restricts the ability to perform the activity as compared with the general population. *Mahon v. Crowell*, 295 F.3d 585, 590-91 (6th Cir. 2002). Where the "major life activity" at issue is "working," the statutory phrase "substantially

11

limits" requires, at a minimum, that the plaintiff show that he is unable to work in a broad class of jobs, or in a broad range of jobs in various classes. *Salim v. MGM Grand Detroit, LLC*, 106 Fed. Appx. 454, 459 (6th Cir. 2004). The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *Id.*

Also, as to all major life activities, the court must consider the effects of medication on the impairment. That is, if the use of medication significantly mitigates the impairment, the plaintiff will have a much harder time demonstrating a substantial limitation of a major life activity. *See Knapp v. City of Columbus*, 192 Fed. Appx. 323, 329 (6th Cir. 2006) ("whether a person has a disability under the ADA is an individualized inquiry. In making this inquiry, we keep in mind that the ADA's coverage is restricted to only those whose impairments are not mitigated by corrective measures. . . . When an ADA plaintiff can fully compensate for an impairment through medication . . . a disability under the Act does not exist.")(internal citation and quotation omitted).

As to both sleeping and sexual activity, the plaintiff testified at his deposition that both sets of difficulties were readily correctable with medication. Indeed, the plaintiff testified that he was able to sleep when he took the Ambien that his doctor had prescribed to him for sleeping. (Docket No. 46 at 205.) Additionally, the plaintiff testified that, while the ADD medication dulled his libido, taking Cialis and Viagra allowed him to perform sexually. (*Id.* at 206.) Therefore, as to sleeping and sexual activity, the court concludes, as a matter of law, that the plaintiff was not disabled under the ADA.

The next issue is whether the plaintiff was substantially limited in the major life activity of

working. Again, this was an issue raised by the plaintiff's treating physician at his deposition, when Dr. Hunt testified that he should have noted this limitation on the plaintiff's RARF. Dr. Hunt's testimony, however, focused on the specific conditions at Romark, noting that the DMM position was "unusually stressful," given the quantity and quality of the work that the plaintiff was expected to perform in this particular working environment, combined with the fact that the plaintiff did not have enough support personnel around him. (Docket No. 44 at 40-42.) Indeed, Dr. Hunt, who apparently does a fair amount of consulting within the pharmaceutical industry, testified that "I don't know any other pharmaceutical company that tries to do [Osborne's] job with one person and no administrative assistant." (*Id.* at 41.)

As indicated above, the analysis of whether the plaintiff is substantially limited in the major life activity of working focuses not on whether the plaintiff's impairment substantially limited the plaintiff's ability to perform the specific job from which he was terminated, but whether the impairment substantially limited the plaintiff's ability to perform a broad range of jobs. Here, the only evidence that the plaintiff's ADD and related mental difficulties substantially limited the major life activity of working is testimony that the unique conditions of the DMM job caused stress with which the plaintiff was unable to cope. That is, the plaintiff has brought forth no evidence that the plaintiff's ADD and other mental challenges would have substantially limited the plaintiff in any job other than the DMM position at Romark.

It is also worth noting that the plaintiff, throughout this litigation, has failed to connect the specific problems that he had at work to his ADD. Instead, the plaintiff offers conclusory statements that his ADD caused a "lack of concentration" that prevented him from performing his

13

job to his employer's satisfaction (Docket No. 46 at 79), and Dr. Hunt testified that ADD can cause "problems with focusing and sustaining attention, and thereby secondary difficulties with kind of rate of processing of information, and – difficulties often with kind of becoming a bit disorganized, losing things, some difficulty with follow through." (Docket No. 44 at 10.)

Accepting that individuals with ADD face these challenges, the plaintiff never effectively addresses how his ADD and other mental difficulties might have actually prevented him from performing the basic tasks that were at the root of his employer's frustration, such as responding to repeated e-mails and phone calls and showing up for meetings that were scheduled well in advance. (*See* Docket No 46 at 91.) Rather, at various points in his deposition, the plaintiff claimed that Crowther was too hard on him in that Crowther hounded him for his failure to follow through on "administrative paperwork," such as weekly reports, and the plaintiff blamed his failure to follow through on such tasks on "conflicts or scheduling or traveling," not on his ADD. (*Id.* at 93.) This lack of connection between the ADD and the root problems is further underscored by Dr. Hunt's RARF submission, which, as noted above, characterizes the plaintiff's impairment as one that is well-controlled with medication and one that should cause mild delays in performance of tasks, not one that excuses the prolonged unprofessional conduct addressed above. For all of these reasons, the court must conclude that the plaintiff was not substantially limited in the major life activity of working.

In sum, the plaintiff has put forth evidence that he had ADD and related mental problems that were well controlled with medication and did not "substantially limit" any "major life activities," as those terms are defined by the ADA. As the plaintiff is not disabled under the

14

ADA, Romark is entitled to summary judgment on the plaintiff's claims.

### B. Other Prongs of the *Prima Facie* Test

As the plaintiff is not disabled under the ADA, he cannot prevail on his ADA and TDA claims here. In the remainder of its brief, Romark argues that, even if the plaintiff were disabled, he could not establish other elements of the test for disability discrimination, because, among other things, Romark had demonstrated that "Romark terminated Plaintiff for nondiscriminatory business reasons, and he cannot show pretext."[5] (Docket No. 37 at 14.) While not necessary to the result here, it is worth noting that the court agrees with Romark that the "undisputed evidence shows that [Romark] terminated Plaintiff for legitimate business reasons that had nothing to do with any alleged disability." (*Id.*)

Indeed, as noted above, significant problems with the plaintiff's work performance were first noted on the plaintiff's Fall 2007 performance review, some six months before the plaintiff informed Crowther that he had what the plaintiff termed "ADHD." For the next year, the performance problems identified in the performance review and elsewhere did not improve. As thoroughly documented in the materials submitted in conjunction with the defendant's briefing, despite additional meetings with and support from management, the plaintiff continued to fail to perform basic professional tasks such as responding to repeated e-mails and phone calls,

---

[5] Romark also argues that the plaintiff cannot demonstrate that he was an "otherwise qualified" individual with a disability because, through his failure to timely submit the RARF, the plaintiff caused a breakdown in the "interactive process" between employer and employee envisioned by the ADA. (Docket No. 37 at 10-11.) This is a more complex argument, and the court need not address it here, as the plaintiff's ADA and TDA claims fail on other grounds.

15

following through on commitments, and timely submitting basic reports. Crowther continued to give the plaintiff multiple opportunities to improve, but, repeatedly, the plaintiff failed to do so. Not only did the plaintiff fail to show up for the scheduled meeting in Nashville or to prepare an acceptable RFP, he failed to communicate any problems or concerns about these matters to Romark. A review of the facts as discussed above plainly shows that the plaintiff was terminated as a last-ditch response to months of unprofessional behavior, not because of any impairment.

It is also worth noting that the plaintiff's briefing on this motion does a weak job defending these claims. The plaintiff's primary argument is that, "except in the most unusual circumstances, matters going to motive and/or perception – here, the motive for Romark's firing Mr. Osborne and its employees' respective perceptions of the circumstances surrounding Mr. Osborne's work and medical condition – cannot stand as predicate for a motion for summary judgment." (Docket No. 53 at 3.) This view of the law would eliminate the potential for summary judgment in the vast majority of employment discrimination suits, and it is inconsistent with the case law discussed above.[6] Otherwise, in large part, the remainder of the plaintiff's brief simply argues that the parties disagree on whether summary judgment is appropriate and,

---

[6] The plaintiff does cite *Walborn v. Erie County Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998) for the proposition that "where, as here, an employee is treated differently after he asserts an ADA-defined disability, an employer's retaliatory motive may be inferred." (Docket No. 53 at 8.) While *Walborn* is a retaliation case and this is a disability discrimination case, the court does not disagree that the plaintiff's case of disability discrimination would be strengthened if he could show that his employer's conduct toward him changed for the worse in the wake of the plaintiff's revealing that he was disabled. Of course, that did not occur here. Rather, the plaintiff started receiving performance warnings six months before he revealed any medical issues to his employer, and, moreover, the record clearly shows that, both before and after the plaintiff revealed his attention problems to his employer, Crowther and others were more than willing to work with the plaintiff to help him through his professional problems.

16

therefore, this case should go to the jury. For instance, as to whether he was disabled, the plaintiff argues that he had "difficulty" with tasks, such as "concentrating" that are "emcompassed" by the ADA. (Docket No. 53 at 7.) The plaintiff completely fails to show, however, that these difficulties could be viewed as amounting to a "substantial limitation" on a "major life activity" as those terms are defined by the ADA.

For all of these reasons, Romark is entitled to summary judgment on the plaintiff's ADA and TDA claims.

### C. Attorneys' Fees

The defendant also seeks its attorneys' fees and costs in connection with defending this litigation. (Docket No. 35 at 3.) Making no formal motion and providing no supporting case law, the defendant simply requests these fees at the conclusion of its briefing materials. (*See id.*)

As in any such case, the defendant may submit a Bill of Costs to the Clerk of Court pursuant to Federal Rule of Civil Procedure 54(d)(1). As to attorneys' fees, in the ADA context, courts may "award attorneys' fees to a defendant only where a plaintiff's claims are unreasonable, frivolous, groundless or vexatious." *Yinger v. City of Dearborn*, 1997 WL 735323, *5 (6th Cir. Nov. 18, 1997). The Sixth Circuit has also noted that "an award of attorney fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Tahfs v. Proctor*, 316 F.3d 584, 596 (6th Cir. 2003)(internal quotation omitted). The court is also not to engage in "post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Id.*

While discovery and briefing have shown that the plaintiff's ADA and TDA claims are without merit, the court does not believe this is the type of "extreme" case that warrants the sanction of attorneys' fees against the plaintiff. At the time of suit, in the plaintiff's mind, there was clearly a temporal connection between the preparation of the RARF and his termination. Moreover, there is no indication from the record that the plaintiff or his counsel engaged in vexatious tactics throughout this litigation. Therefore, while the court believes that this case was not particularly close and understands the frustration and expense of defending such a case, this is not an example of the truly rare case in which a plaintiff should be sanctioned for asserting a discrimination claim.

## **CONCLUSION**

As the plaintiff has failed to establish a *prima facie* case of disability discrimination, the plaintiff's ADA and TDA claims fail, and, as such, the defendant's Motion for Final Summary Judgment will be granted, and this case will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge